## COLUMBIA CHEESE CO. et al. v. McNUTT, Federal Security Adm'r.

### No. 239.

Circuit Court of Appeals, Second Circuit.

Aug. 20, 1943.

Martin A. Fromer, of New York City (Martin A. Fromer and Leo Pfeffer, both of New York City, of counsel), for petitioners.

Wendell Berge, Asst. Atty. Gen., and Oscar A. Provost and Edward G. Jennings, Sp. Assts. to Atty. Gen. (Edward B. Williams, Atty., Federal Security Agency, of Washington, D. C., of counsel), for respondent.

Before SWAN, CHASE, and CLARK, Circuit Judges.

CHASE, Circuit Judge.

The petitioners are cheese manufacturers who allege that they are adversely affected by the order and regulations which will be discussed later in greater detail and they brought this proceeding for judicial review in accordance with § 701(f) of the Act, 21 U.S.C.A. § 371(f), which provides for such a review in cases of actual controversy.

The administrative proceedings which led to the issuance of the order here under review began in August of 1939 with the object of establishing a definition and standard of identity for cream cheese; and these resulted in a proposed order which was issued on September 28, 1940, with findings of fact and a proposed regulation. But on application of the petitioners, who filed exceptions to the order, the hearing was reopened and consolidated with a hearing on proposals for standards for neufchatel, cottage and creamed cottage cheeses. This hearing resulted in a final order of December 22, 1942, which substantially rejected petitioners' arguments

in favor of standards which would allow lower fat and higher moisture content in the manufacture of these cheeses.

The regulations, Code of Federal Regulations, Title 21, Pt. 19, which are now under attack are in substance as follows: Sec. 19.515 requires that cream cheese contain by weight not less than 33% of milk-fat and not over 55% of moisture; that it must be made from a pasteurized starting mixture of cream with milk or skim milk or both, to which may be added lactic acid producing bacteria; that it may be "hot-packed" and that designated moisture-retaining gums, not to exceed 0.5% by weight, may be used provided the presence of these gums is stated on the label. Cream, milk or skim milk or a mixture of two or all of these may be used if the product is "hot-packed"; and water, since it was not specified, may not be used. Sec. 19.520 sets the standard for neufchatel cheese and prescribes that the manufacture and basic ingredients be the same as cream cheese except that the milk fat content may vary from 20 to 32% inclusive and a moisture content up to 65% is allowed. Sec. 19.525 requires that cottage cheese have a moisture content of no more than 80% and that it be made from pasteurized sweet skim milk; and by Sec. 19.530 creamed cottage cheese must contain no more than 80% by weight of moisture and must be made so that at least 4% of milk fat is added by "mixing cottage cheese with pasteurized cream or a pasteurized mixture of cream with milk or skim milk or both."

The questions presented on this review are whether the Administrator's definitions and standards of identity, establishing the fat and moisture content of cream and neufchatel cheeses are supported by substantial evidence of record; are reasonable definitions and standards of identity; will promote honesty and fair dealing in the interests of consumers; and establish definitions of the foods in question under their common names so far as is practicable; whether the standards which fail to provide for the addition of water in the "hot-pack" process of manufacture of cream and neufchatel cheeses are reasonable and based on substantial evidence; whether the cottage cheese standard, which requires the use of pasteurized skim milk, is valid under the Act and whether the standard requiring a maximum of 80% moisture content is based on

substantial evidence; and finally, whether the creamed cottage cheese standard, which calls for the addition of milk fat after the making of the curd, and not before, is valid.

■ It will be helpful to state at the outset that the scope of review of an order of the Administrator of the Federal Food, Drug and Cosmetic Act is necessarily limited, as Federal Security Administrator v. Quaker Oats Co., 318 U.S. 218, 63 S.Ct. 589, 87 L.Ed. —— shows clearly enough, and does not allow the substitution of the court's judgment, even though the court on the same record might reach a conclusion different from that of the Administrator. The order of the Administrator must, therefore, be affirmed if it is supported by substantial evidence of record and is within statutory and constitutional limitations. The question, then, presented by this review is largely one of determining whether the Administrator's findings were supported by the evidence and whether his order conformed to the statutory purposes of the Act.

The Administrator found that there are produced and marketed various cheeses of a soft uncured nature, but that these cheeses, while they have similar characteristics, have separate and distinct identities. These cheeses have the same basic constituents (coagulated proteins of milk, soluble nonfat milk solids, and varying proportions of water and milk fat) and it is by changing the proportions of the basic constituents in the starting mixture that the differences in characteristics are obtained. Of these soft uncured cheeses cream cheese was found to be the relatively high-fat, low-moisture cheese, containing traditionally from 35 to 40% or more of fat and 55 to 50% or less of moisture, although in good commercial practice the percentages might vary 2% above or below what the manufacturer sought to obtain.

One of the problems in the manufacture of cream cheese has been the leakage of moisture, which renders the cheese less attractive and correspondingly less merchantable. But in 1927 or thereabouts it was discovered that moisture leakage could be largely prevented by the addition of harmless vegetable gums, such as carob or locust bean gum, or karaya gum, or tragacanth gum; and it was found that the use of these gums for this purpose, up to 0.5% by weight, could not be abused when the moisture content of cream

cheese is restricted. But following the discovery that gum could be used to prevent leakage it became the practice of many manufacturers to heat the gum and curd together so as to disperse the gum in the curd, by homogenization, and it became possible by this "hot-pack" process to raise the moisture and lower the fat content of the cheese without losing the appearance and texture of cream cheese. Thus it was found that most of the cheese made by this process contains from about 23 to 30% of fat and from about 60 to 65% of moisture, whereas cheeses with the same percentage of fat and moisture made by the older method of manufacture would have a softer texture than that which was found to be the traditional cream cheese. It was also found that the desired percentage of fat and moisture in the "hot-pack" process could be obtained by adding the proper amounts of cream or milk or skim milk, or any combination of these, before the curd is heated and homogenized; and that water has also been used for this purpose, although skim milk can be used to accomplish anything that water does in moisture adjustment.

Consumers, it was found, cannot readily distinguish between the cream cheese made by the older process and the lower-fat, higher-moisture cheese made by the "hot-pack" process; and since fat content is the chief item of expense in such cheeses retailers sometimes sold the cheaper product as "cream cheese" which was natural enough since consumers, unlike manufacturers, wholesalers and retailers, were not always acquainted with or informed of the esoteric terms of qualification used in the trade, such as "low test," "cheap," "second grade," "No. 2," or as often as not by some arbitrary brand name. The cheaper product being sold consumers was found by the administrator to be more closely akin to neufchatel cheese, which was found to be the common or usual name of a cheese made by the same process as cream cheese, but having a fat content of a minimum of 20% and a moisture content of a maximum of 65%. This type of cheese, prior to about 1920, was marketed in substantial quantities, but gradually the market declined until it almost vanished because of a progressive cheapening of the product in quality.

The findings in respect to the cottage cheese group were, briefly, as follows: cottage cheese is made from skimmed milk in just about the same way as cream cheese is with a starting mixture that is usually something less than 1½% of milk fat and something less than 80% of moisture. A moisture content of no more than 80% was, therefore, found to be reasonable. By adding milk fat (4% was found to be reasonable) the product known as creamed cottage cheese can be obtained. This group of cheeses like cream cheese and neufchatel, was found to be highly perishable because of the growth of bacteria, yeasts and molds, which could to some extent be stopped by pasteurization of the starting mixture, to which is then added lactic acid producing bacteria. These bacteria develop independently of the others and account for the eventual spoilage of the cheese. Some manufacturers have added chemicals to slow down the spoilage, but this was found to be uncommon as a trade practice, since consumers are generally acquainted with the process of spoilage and do not buy soft uncured cheeses in such quantities as to make this a real problem. Based on these findings the Administrator issued the regulations already referred to.

■ One of petitioners' chief objections to the regulations promulgated by the Administrator is that a substantial portion of the cheese manufactured by them must be designated as neufchatel cheese. This follows from the fact that much of their cheese contains 25 to 30% of milk fat and 57 to 61% of moisture. Petitioners take the position that the name neufchatel fails properly to identify their product and that it will mislead consumers; that it is foreign sounding, not easy to pronounce and has fallen into disrepute and dislike because of an inferior product formerly marketed under the name; that it imposes an unreasonable hardship on a whole industry; and that it will drive a wholesome product from the market. And they suggest that the Administrator would have done better if he had used the designation cream cheese with some sort of qualification such as Grade B or No. 2. But it is not our function, as has been pointed out before, to substitute our judgment of what might be a proper name for that of the Administrator. He chose the designation neufchatel; and there was substantial evidence to support such a choice. One witness, Stine, testified, for example, that consumers would be misled if the cheaper product continued to be labeled as cream cheese and he

therefore recommended neufchatel as a good name. Moreover, there were findings supported by the evidence that neufchatel had been the name of that group of soft uncured cheeses which was next below the high fat content cheese commonly known as cream cheese. It was therefore within the power of the Administrator to identify cheeses of the kind that the petitioners make with the name he did. The fact that neufchatel had fallen into disrepute in the 1920's is of no particular significance so long as he could find, as he did, that cheese made with a fat content of below 33% and with a moisture content of above 55% was not the product cream cheese as it was traditionally known. Nor does petitioners' assertion that these standards of identity will create a monopoly for one manufacturer make the order unlawful. If they continue to make the product they now make, they can sell it as neufchatel; and if they want to make a product that they can sell as cream cheese, they need only comply with the standards of the product that the Administrator has identified as cream cheese.

■ The petitioners also argue that the Administrator did not use the name, so far as it was practicable, which commonly identified the product sold; and that in the absence of a specific finding that it was not practicable to label their product cream cheese, the regulations identifying these various groups of cheeses must fall. The practicality of one name or another name is not, of course, a matter for our judgment. Even though the name chosen would drive a healthful product from the market, or depress existing standards of a product now being marketed, that name or the name withheld from a product cannot be said by us to be unreasonable or improper so long as there were findings and substantial evidence to support them which justified the action of the Administrator. And there were such findings.

■ The many findings attacked by the petitioners as unsupported by substantial evidence are, as we have already intimated, supported by enough evidence so that they must stand even though this court on the same record might have reached a different conclusion. See Federal Security Adm'r v. Quaker Oats Co., 318 U.S. 218, 228, 63 S.Ct. 589, 87 L.Ed. ——. Findings 20, 23 and 37, which cover the fat and moisture contents of cream cheese, are supported by evidence, some-

what contradicted to be sure, but nevertheless substantial, that much, if not most of the cream cheese sold before the discovery of the "hot-pack" process contained from 35 to 40% of fat and from 55 to 50% of moisture. And the Administrator also justifiably found that when the fat content went down and the moisture content up the appearance, smell, feel and taste of the resulting product became less characteristic of cream cheese as consumers knew it, although the demarcation was not easy to define. He, therefore, found it reasonable to fix 33% of fat content or above as the proper figure for identifying cream cheese; and this figure was arrived at by allowing a 2% variation in the process of manufacture. And he set the maximum moisture content at 55%, which as the petitioners point out, was peculiar to say the least since a 2% variation was not allowed in this constituent of the product. But his decision on this score is supported by finding 22 which shows that a product of more than 55% of moisture, if not subjected to the "hot-pack" process, acquires different but closely related characteristics of cream cheese. That determination was not unreasonable in view of the evidence of leakage if the moisture content exceeded this amount in the absence of the use of moisture retaining gums. The finding that water was sometimes used by manufacturers in adjusting the moisture content, but that skim milk could accomplish the same result, and was therefore prescribed, was also supported by evidence that in good commercial practice water was not used. The Administrator could believe this if he chose because, as we reiterate, it is his judgment and not ours that must be given effect when based upon facts in evidence. As to the finding that the cheaper product was not accompanied by a uniform differentiation in price, the evidence was again conflicting but yet substantial. That is likewise the case with findings 11 and 41 which relate to the fat content of the starting mixtures.

■ The findings and regulations in respect to cottage and creamed cottage cheeses must also be upheld on the evidence in this record. The prescription of a moisture content of no more than 80% was based on substantial evidence that most cottage cheese in good practice contained no more than this and usually contained less. As to the requirement of pasteuriza-

tion, this was supported by evidence and findings that it was usually done and that it prevented spoilage to some degree in a highly perishable product by killing bacteria, yeasts and molds not necessary to the manufacture of the cheese. And the regulation requiring the addition of 4% of fat to the curd after the making of the curd, instead of before, was not unreasonable. Even though some manufacturers might prefer to use a process differing from the one required, it was permissible on the evidence for the Administrator to conclude that good commercial practice and a proper identification of the product called for in the addition of fat after the formation of the curd since there was evidence that the resulting product was different.

Bound as we are by these adequately supported findings of the Administrator, Federal Security Adm'r v. Quaker Oats Co., supra, his action based upon them cannot be disturbed.

Affirmed.

SWAN, Circuit Judge (dissenting in part).

I am unable to agree with my brothers that the order should be in all respects affirmed.

For many years cheese having less than 33% of milk fat has been sold as "cream cheese." Almost every one in the industry, with the exception of the Kraft Cheese Co., objects to the requirement that such cheese hereafter be called "neufchatel." The statute, 21 U.S.C.A. § 341, authorizes the Administrator to promulgate regulations "establishing for any food, under its common or usual name so far as practicable, a reasonable definition and standard of identity," etc. There is no finding that it is impracticable to use the common name and distinguish between cheese of different milk fat content by adjectives, for example, light cream cheese or heavy cream cheese. Without at least a finding of impracticability. I think it unreasonable to deprive the bulk of the industry of their good will in the commonly used name.

Next, take the standard of 33% fat and 55% moisture. Finding 21 says that in good commercial practice the percentages of fat and moisture vary as much as 2% above or below. In recognition of such variation the 35% for fat (Finding 20) was dropped to 33%, but the 55% for mois-

ture was not raised to 57%. This seems to me an arbitrary disregard of Finding 21.

As to the prohibition against adding water in the "hot-pack" process, there is a finding that water is sometimes used (Finding 27) and no finding of any reason why that practice must be discontinued. I think the findings fail to support this part of the order.

As to the cottage cheese the Administrator ignored the evidence as to the use of unpasteurized skimmed milk. He made no finding on the subject. The right to present evidence is a barren one if the trier of fact may fail to consider it. See A. E. Staley Mfg. Co. v. Secretary of Agriculture, 7 Cir., 120 F.2d 258, 261. I would send the case back for findings before approving this part of the order.

I agree that the order is supportable in so far as it relates to creamed cottage cheese.