TENNESSEE VALLEY HAM
COMPANY, INC., Plaintiff,

v.

Bob S. BERGLAND, as Secretary of
Agriculture, et al., Defendants.

No. 78–1103.

United States District Court,
W. D. Tennessee, E. D.

July 21, 1980.

Richard L. Dunlap, III, Paris, Tenn., for plaintiff.

C. Max Vassanelli, M. Susan Carlson, U. S. Dept. of Justice, Anthony J. Buccitelli, U. S. Dept. of Agriculture, Washington, D. C., Joe A. Dycus, Asst. U. S. Atty., Memphis, Tenn., for defendants.

Richard D. Siegel, Washington, D. C., R. A. Ashley, Jr., Dyersburg, Tenn., for defendant-intervenor-American Association of Meat Processors.

ORDER

WELLFORD, District Judge.

This is a challenge by a producer of country hams to an administrative regulation promulgated by the United States Depart-

ment of Agriculture pursuant to its authority under the Federal Meat Inspection Act, 21 U.S.C. § 601 *et seq.* Essentially, the regulation prescribes the process which a producer must follow in order to use the label "country" or "country style" in connection with the sale of pork products.

## I. *Facts*

Plaintiff is a Tennessee corporation which operates a meat processing plant and manufacturers products subject to inspection and regulation by the United States Department of Agriculture under the Federal Meat Inspection Act. Defendants are the Secretary of Agriculture and other administrators within that federal agency.

The jurisdiction of this Court is properly invoked under 21 U.S.C. § 674. Plaintiff seeks judicial review of agency action under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* Plaintiff asserts in this suit that certain provisions in section 319.106 of the Federal Meat Inspection Regulations, 9 CFR 319.106, are arbitrary and capricious, constitute an abuse of discretion, and were promulgated in excess of the agency's statutory authority. This regulation prescribes certain processing standards that must be complied with by producers in order to use the labels "country," "country style," or "dry cured" in connection with the marketing of ham or pork products. Plaintiff specifically challenges subsections (5) and (6) of the regulation which set certain minimum time periods and maximum temperature limits:

> (5) For hams or pork shoulders labeled "country" or "country style," the combined period of curing and salt equalization shall not be less than 45 days for hams, and shall not be less than 25 days for pork shoulders; the total time for curing, salt equalization, and drying shall not be less than 70 days for hams, and shall not be less than 50 days for pork shoulders. During the drying and smoking period, the internal temperature of the product must not exceed 95 ° F., provided that such temperature requirement shall not apply to product dried or smoked under natural climatic conditions.

> (6) For hams or pork shoulders labeled "dry cured," the combined period for curing and salt equalization shall not be less than 45 days for hams, and shall not be less than 25 days for pork shoulders; and the total time for curing, salt equalization, and drying shall not be less than 55 days for hams and shall not be less than 40 days for pork shoulders.

Although only these two subsections were challenged in the complaint, plaintiff's request for a preliminary injunction[1] also sought relief with respect to subsection (7). Since plaintiff never requested permission to amend its complaint, however, judicial review of subsection (7) has not properly been invoked. In any event, the Court considers the few arguments presented with respect to this subsection plainly insufficient to satisfy plaintiff's burden of persuasion as to subsection (7).

Both parties have moved for summary judgment, presenting two basic questions: (1) whether USDA has the statutory authority to promulgate the type of regulation which section 319.106 represents; and (2) whether the particular provisions challenged here are arbitrary and capricious or unsupported by a rational basis.

## II. *Statutory Authority*

Plaintiff contends that defendant does not have the authority to promulgate a regulation that prescribes a particular process or preparatory procedure. Rather, plaintiff asserts, the agency may only prescribe the necessary content or composition of the finished product. Plaintiff argues that the agency is attempting to achieve an impermissible objective, the regulation of taste quality.

The defendant agency acted in an attempt at industry request to resolve a controversy among producers of "country" ham and pork products about concern over alleged product decline caused by competitive pressures for cheaper production techniques and shorter production times. Defendant asserts that the challenged regulation was

---

1. The request for preliminary injunction was denied. *See* Order of March 9, 1979.

necessary to insure that ham and pork products merchandized in association with the term "country" are accurately labeled for the benefit of consumers and to insure a product possessing properties or characteristics "traditionally associated" with "country style" products. The agency concedes that the regulation was not motivated by health or nutritional considerations.

 Whether a particular regulation exceeds statutory authority depends upon whether it is "reasonably related to the purposes of the enabling legislation." *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973); *Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268, 280–81, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969). The power of a federal agency is circumscribed by the authority granted by Congress. *Stark v. Wickard*, 321 U.S. 288, 309, 64 S.Ct. 559, 570, 88 L.Ed. 733 (1944). An agency, however, is allowed reasonable discretion in interpreting the scope of authority conferred, *Peters v. Hobby*, 349 U.S. 331, 345, 75 S.Ct. 790, 797, 99 L.Ed. 1129 (1955), and its action will be upheld even if not within explicit statutory authority, when and if it represents a legitimate, reasonable, and direct adjunct to the power explicitly conferred. *United States v. Chesapeake and Ohio Railroad Co.*, 426 U.S. 500, 96 S.Ct. 2318, 49 L.Ed.2d 14 (1976).

Is the Federal Meat Inspection Act, 21 U.S.C. § 601, *et seq.*, a sufficient basis for the challenged regulation? The legislative findings underlying this Act were set forth originally in 1907 and are presently contained in 21 U.S.C. § 602:

Meat and meat food products are an important source of the Nation's total supply of food . . . It is essential in the public interest that the health and welfare of consumers be protected by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged. Unwholesome, adulterated, or misbranded meat or meat food products impair the effective regulation of meat and meat food products in interstate or foreign commerce, are injurious to the public welfare, destroy markets for wholesome, not adulterated, and properly labeled and packaged meat and meat food products, and result in sundry losses to livestock producers and processors of meat and meat food products, as well as injury to consumers. The unwholesome, adulterated, mislabeled, or deceptively packaged articles can be sold at lower prices and compete unfairly with the wholesome, not adulterated, and properly labeled and packaged articles, to the detriment of consumers and the public generally. It is hereby found that . . . regulation by the Secretary and cooperation by the States and other jurisdictions . . . are appropriate to prevent and eliminate burdens upon such commerce, to effectively regulate such commerce, and to protect the health and welfare of consumers.

To effectuate the purposes of the Act, 21 U.S.C. § 607 provides (in part):

(d) No article subject to this subchapter shall be sold or offered for sale by any person, firm, or corporation, in commerce, under any name or other marking or labeling which is false or misleading, or in any container of a misleading form or size, but established trade names and other marking and labeling and containers which are not false or misleading and which are approved by the Secretary are permitted.

Section 610 of the Act further provides that no person shall:

. . . . (c) sell, transport, offer for sale or transportation, or receive for transportation, in commerce, (1) any such articles which (A) are capable of use as human food and (B) are adulterated or misbranded at the time of such sale, transportation, offer for sale or transportation, or receipt for transportation.

The term "misbranded" is defined by § 601 in part, as follows:

(n) The term "misbranded" shall apply to any carcass, part thereof, meat or meat food product under one or more of the following circumstances:

(1) if its labeling is false or misleading in any particular;

(7) if it purports to be or is represented as a food for which a definition and standard of identity or composition has been prescribed by regulations of the Secretary under section 607 of this title unless (A) it conforms to such definition and standard, and (B) its label bears the name of the food specified in the definition and standard and, insofar as may be required by such regulations.

. . . .

With regard to definitions and standards of identity or composition, § 607 provides that:

. . . (c) The Secretary, whenever he determines such action is necessary for the protection of the public, may prescribe:

. . . . (2) definitions and standards of identity or composition for articles subject to this subchapter . .

In addition, the Secretary is given general rulemaking authority by § 621 to ". . . make such rules and regulations as are necessary for the efficient execution of the provisions of this subchapter . . ."

In this present case, defendants have promulgated standards of identity or composition for ham and pork products bearing the terms "country," "country style," or "dry cured" on their labels. The origins of standards of identity lie in the history of economic adulteration law. *See* Forte, *Definitions and Standards of Identity for Foods*, 14 U.C.L.A.L.Rev. 796, 798–802 (1967):

In the late 1800's and early 1900's there was a proliferation of debased foods which were passed off on unsuspecting consumers. These foods were regarded as economically adulterated since they involved pecuniary frauds rather than dangers to health. In its crudest manifestations, economic adulteration took the form of milk diluted by water, coffee diluted by chicory, and oats diluted by chaff. More sophisticated economic adulteration took the form of a reduction of the fruit content of jam, a bleaching of flour to make it appear to be made from expensive wheat, and an artificial coloring of macaroni to make it appear to be made from semolina rather than less expensive durum. An aroused public demanded protection against such cheats and it was in this context that the first federal legislation regulating foods in general, the 1906 Food and Drugs Act, was enacted. [citations omitted].

Early legislation proved inadequate to combat economic adulteration, primarily because of the problem of proving the standard against which a food product was to be judged. *Id.* at 799. The Food, Drug, and Cosmetic Act of 1938, 52 Stat. 1046, 21 U.S.C. § 301 *et seq.*, was then enacted which first authorized establishment of standards of identity for foods on a broad scale. The legislative history of this Act reveals a concern about consumer fraud through the sale of cheapened products masquerading as traditional staples:

The government repeatedly has had difficulty in holding such articles as commercial jams and preserves and many other foods to the time-honored standards employed by housewives and reputable manufacturers. The housewife makes preserves by using equal parts of fruit and sugar. The fruit is the expensive ingredient, and there has been a tendency on the part of some manufacturers to use less and less fruit and more and more sugar . . . By authorizing the establishment of definitions and standards of identity this bill meets the demands of legitimate industry and will effectively prevent the chiseling operations of the small minority of manufacturers . .

H.R.Rep.No.2139, 75th Cong., 3d Sess. (1938); *see also* C. Hackson, *Food and Drug Legislation in the New Deal* (1970) at 5, 195.

■ Congress focused primarily on dangers presented by the sale of unwholesome foods, but the authority to promulgate standards of identity was conferred to prevent economic adulteration—the erosion of food "integrity" and the sale of products inferior

to those which the consumer expected to receive. *Federal Security Administration v. Quaker Oats Co.*, 318 U.S. 218, 230, 63 S.Ct. 589, 596, 87 L.Ed. 724 (1943). This Congressional purpose underlies the provisions authorizing promulgation of standards of identity under the Federal Meat Inspection Act. *Armour and Co. v. Ball*, 468 F.2d 76, 80 (6th Cir. 1972).

■ Plaintiff in this action asserts that USDA has no authority to promulgate a regulation such as § 319.106 because it prescribes a particular process that must be followed and because its purpose is to regulate taste quality.

The process used and the ultimate composition of food products are difficult to distinguish; process dictates resulting composition. Logically, if USDA may prevent the addition of water or other inferior or adulterating substances by regulating final composition, it may ban a chemical or biological procedure which causes identical adulteration. In addition, plaintiff concedes procedural prescriptions are permissible when necessary to protect public health. *See, e. g., United States v. Nova Scotia Food Products Corp.*, 568 F.2d 240 (2d Cir. 1977). If process may be regulated when health dangers exist, it may also be regulated when necessary to prevent economic adulteration. The law in question simply draws no relevant distinction between these dual concerns. Thus, when USDA has a legitimate basis to promulgate a standard of identity, it may also prescribe either final composition or the process that must be utilized. Defendants may then set out a particular process to be used.

The crucial question here, however, is not whether defendants may prescribe a particular process, but whether they may do so in an attempt to regulate standards of taste quality. Defendants assert that the regulation in question does not attempt to regulate taste, but rather seeks to insure certain basic qualities or characteristics in hams marketed as "country." The agency concedes that traditional health and nutritional concerns are absent. Other prescriptive provisions, such as the requirement of mini-mum shrinkage and the application of a salt cure, will protect the consumer from moisture "adulteration." The minimum time and maximum temperature provisions, however, were clearly included in response to complaints that accelerated procedures were eroding *traditional taste characteristics and qualities.* While the agency may not have attempted to impose requirements that would result in a completely uniform taste throughout the country ham industry, the provisions challenged by plaintiff unquestionably purport to establish at least some minimum taste standards.

The statutory language and legislative history above recited do not definitively indicate whether or not the defendant agency has authority to promulgate standards directed at taste quality. Congress was obviously concerned with quality in one sense, but the primary focus has been on the inserting or mingling of cheaper substances, additives, that are tangibly different from the produce being labeled or sold. For example, water is not milk, cereal is not sausage, and sugar is not fruit. Adulteration of this type may be discerned through application of scientific methods to test and analyze the final product.

The only statutory definition of "adulteration" arguably relevant to this case reflects this concern with *objective* dilution:

if any valuable constituent has been in whole or in part omitted or abstracted therefrom; or if any substance has been substituted, wholly or in part therefor; or if damage or inferiority has been concealed in any manner; or if any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight, or reduce its quality or strength, or make it appear better or of greater value than it is . . . ..

21 U.S.C. § 601(m)(8). The phrase "or if damage or inferiority has been concealed in any manner" could conceivably be applied to the present regulation.

Here, however, the adulteration arguably present results from the sale of a product that, due to an allegedly cheapened preparatory process, does not taste as the consum-

er expects it to taste. The agency's action in this area of taste manifestly concerns a subjective matter.[2] Individual expectations and preferences vary greatly. It is difficult to adjudge whether a ham aged for a relatively short period of time at a relatively high temperature is a "country" ham, or whether it is simply an inferior product denoted a "country ham." The distinction is difficult or impossible to measure by application of objective criteria.

As plaintiff notes, moreover, this type regulation has an almost unlimited potential for expansion. It is preferable under a system emphasizing individual freedom to select according to one's choice to leave subjective matters of taste quality to the consumer's discretion so long as the consumer is provided with adequate information concerning product content and processing. . See Merrill and Collier, *"Like Mother Used to Make": An Analysis of FDA Food Standards of Identity*, 74 Colum. L.Rev. 561 (1974) (the authors there conclude that promulgation of standards of identity frequently produces adverse competitive effects, discourages technological innovation, and creates other unjustifiable social costs, and advocate that federal agencies employ the alternative regulatory technique of requiring fuller disclosure on product labels).

The advisability and desirability of a particular type of regulatory scheme, however, is a question that must be left for Congressional determination within reasonable and due process limitations. First, Congress' concern with economic adulteration is broad; it has sought to afford the relevant federal agency broad regulatory tools to combat sophisticated forms of adulteration to preserve time honored traditions.

Second, there is some precedent on the interesting problem here involved. The decision in *Columbia Cheese Co. v. McNutt*, 137 F.2d 576 (2d Cir. 1943), *cert. denied*, 321 U.S. 777, 64 S.Ct. 618, 88 L.Ed. 1070 (1944), is difficult to distinguish, plaintiff's valiant attempts to the contrary notwithstanding.

There plaintiff challenged regulations prescribing the processes that had to be followed by manufacturers of certain types of cheese. Although the process-type regulation had no discernible purpose other than taste quality control, the court upheld the agency action:

> The regulation requiring the addition of 4% of fat to the curd after the making of the curd, instead of before, was not unreasonable. Even though some manufacturers might prefer to use a process differing from the one required, it was permissible, on the evidence, for the Administrator to conclude that good commercial practice and a proper identification of the product called for the addition of fat after the formation of the curd since there was evidence that the resulting product was different.

137 F.2d at 581. *See also Atlas Powder Co. v. Ewing*, 201 F.2d 347 (3d Cir. 1952), in which the agency had prohibited the use of a softening agent that bread manufacturers were adding to their products. One of the justifications offered by the agency and sustained by the court was evidence that consumers preferred fresh bread and would be deceived by the softening agent, which would make bread appear to be fresher than it actually was. Although there was no evidence that fresher bread possessed any beneficial quality, nutritional or otherwise, not also possessed by the artificially softened bread or that consumers could actually tell the difference, the court upheld the actions of the agency.

These two decisions, along with those in *Federal Security Administrator v. Quaker Oats Co., supra*, and *Armour and Co. v. Ball, supra*, express a deferential approach toward food regulation adopted by the courts. In addition, other regulations promulgated by FDA and USDA prescribe processes for no other purpose than to insure particular taste characteristics. These include several cheese regulations (upheld in *Columbia Cheese*) and a USDA regulation concerning the preparation of bar-

---

2. One intra-agency memorandum contained in the record expresses the view of one agency official that taste is a subjective matter inappropriate for regulation.

bequed meats. 9 CFR 319.80. The absence of Congressional action to curtail the scope of agency authority in the years following promulgation of these regulations lends some support to USDA's present interpretation of its powers.

For the reasons enumerated, the Court with expressed reservations determines that USDA has the statutory authority to promulgate the type of regulation challenged in this case. The Court shares, however, plaintiff's concern with the power of a federal agency to set taste standards even when accompanied by sincere motivation for the "public good."

II. *The Rationality of § 319.106*

In addition to challenging the statutory authority of the agency, plaintiff also claims that certain provisions of § 319.106 are irrational, arbitrary, and capricious. The Court must determine first whether the agency's conclusion that a consensus exists as to the taste characteristics that a country ham or pork product should possess is supported by a rational basis. Without some general consensus, there is no basis for the agency's attempt to establish minimum standards. If consumers have completely disparate views on the desirable taste qualities of country hams, no real danger of deception or "taste adulteration" can be present. Second, the Court must determine whether the particular regulatory prescriptions promulgated by the agency to insure certain taste characteristics are similarly supported by a rational basis.

The appropriate standard of judicial review here is provided by 5 U.S.C. § 706(2)(A), which authorizes a reviewing court to hold unlawful and set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *National Foods Association v. Weinberger*, 512 F.2d 688, 700 (2d Cir. 1975). Thus the Court's inquiry is limited to determining whether the regulation is rationally supported by the record. *Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228, 238 (8th Cir. 1975), *cert. denied*, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976).

The burden is on the party challenging the regulation, but it has also been stated that the agency must articulate a rational connection between the facts found and the decision made. *Bowman v. Arkansas Best Freight System*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974). In addition, the agency's decision must have been based on a consideration of all the appropriate and relevant factors. *Chrysler Corp. v. Department of Transportation*, 472 F.2d 659, 670–71 (5th Cir. 1972).

The agency's determination that a sufficient consensus exists among consumers and "the industry" to justify the promulgation of a standard of identity to prevent economic adulteration and deception may not be deemed arbitrary and capricious. The argument of plaintiff is that there is simply no consensus as to how a "country" ham should taste, or alternatively, that if the agency is going to act on this basis to require "taste" standards, it should be required to identify characteristic taste qualities with specificity.

It is virtually conceded that certain regional differences exist as to some particulars of the preparation process. Virtually all processors, trade associations, state agricultural departments, and the few consumers who responded during the rule-making process, however, agreed that "country ham" conveys a generic meaning that should be reflected in a regulation prescribing a standard of identity to preserve traditional taste quality. Indeed, this view was expressed with some reservation in a letter to USDA written by an officer of Tennessee Valley Ham itself:

> We feel there is some merit to the proposal that "country" should be considered as generic when used in labeling hams and shoulders, referring to product characteristics rather than geographic location, but we feel some problems could arise . . .

(Letter from Dan Murphey of October 22, 1975, Exhibit 6 to Defendant's Memorandum of March 7, 1979.)

If those producers, trade associations, and state agriculture departments who asserted that a generic product exists had widely divergent and incompatible views as to the process required to produce a country ham, a true consensus would be absent.

USDA has never attempted a precise definition of the characteristics normally associated with "country" products. Perhaps a definition more precise than those general qualities articulated is impracticable when taste characteristics are concerned. If standards of identity to prevent adulteration of the traditional tastes of products as to which some generic expectation exists among consumers, the only logical course the agency can follow is to prescribe certain compositional requirements and/or to prescribe certain procedures that must be followed. Section 319.106 attempts to do both of these things.

Are the quoted sections of 9 CFR 319.106 irrational, arbitrary and capricious in setting certain minimum curing and drying periods, and in selling maximum temperatures during drying and smoking periods? Are they equally objectionable and illegal in setting minimum time periods for curing and salt equalization and drying in "dry cured" ham and pork products? In reaching these questions the Court must first determine whether there is some general consensus concerning these time and temperature requirements that would give a rational basis support to the regulations in dispute. To put it another way, completely disparate views about desirable taste qualities of "country" products would present no real danger of deception or "taste adulteration."

The Court's focus must therefore shift to the particular provisions challenged by plaintiff after a review of the notice and comment rule-making procedure undertaken by the agency.

The USDA first published notice of its intent to establish a standard of identity for country ham and pork products on July 17, 1971 (Federal Register, Vol. 36, No. 138 at 13273). The agency stated that it was acting pursuant to a petition by a group of meat processors in North Carolina who provided "considerable" information concerning processing practices obtained from universities, processors, state agencies, and trade organizations.

Among other requirements, the first proposed standards provided that the combined minimum number of days for curing and salt equalization could not be less than 50 days at a temperature not higher than 42° F. nor lower than 36° F. If smoked with heat, the smokehouse temperature could not exceed 100° and the internal temperature of the product could not exceed 90°. For drying (aging) under controlled atmospheric conditions, a minimum of 45 days was prescribed. Under natural conditions, the product had to be dried at least 90 days.

On July 13, 1972, the agency published a second proposed standard. (Federal Register, Vol. 37, No. 135 at 13717). This notice stated that 145 written comments were received on the first proposal and that additional views were expressed orally. The agency asserted that, although the comments differed considerably, general agreement was indicated on the following points: 1) the term "country" should be considered generic and a standard of identity was warranted; 2) ham and pork products labeled "country" should be dry cured, have a salt content of at least 4% throughout and shrink during processing not less than 18% from the weight of the raw uncured meat; 3) the products must be free of live trichinae; and 4) the processing should produce a product capable of distribution without refrigeration.

A significant number of comments recommended that the standard be sufficiently flexible to permit processors to prepare products with variable flavor and texture characteristics. To achieve this flexibility, many comments advocated the allowance of the addition of sweetening agents, spices, and other nutritive flavorings.

According to the agency, comments on the preferable curing and salt equalization time periods lacked unanimity, but generally agreed that the combination of the periods should not be less than 50 days, which

was the standard adopted. The agency further stated that the comments indicated that processing procedures following curing and salt equalization have differed widely. Numerous comments indicate that drying practices produce a variety of tastes desired by consumers and requested that the standard allow flexibility in this area. Thus the second proposal contained *no aging period* limitation.

The proposal did require, however, that, if and when dried, the product's internal temperature could not exceed 95°. This provision was justified as follows:

> A requirement for a maximum internal temperature for the cuts when heated during the drying period is necessary in order to prevent the destruction of natural enzymes needed for development of characteristic product flavors. The comments suggest that allowing a temperature in excess of 95° F. would not be consistent with processing practices that have been traditionally associated with hams and pork shoulders merchandized as "Country."

A third proposal was published on September 5, 1975. (Federal Register, Vol. 40, No. 173 at 41139). The forty-seven comments received in response to the second proposal were, according to USDA, generally favorable, except for continued disagreement over the time periods necessary for curing, salt equalization, and again, the maximum temperature appropriate during aging. In the interim, the agency had conducted a survey of processing procedures in several states, the results of which were described as follows:

> A review of 230 processing procedures for country cured products revealed that the majority of plants are using procedures which do not raise the product's temperature above 95° F., and require at least 70 days for hams, and 50 days for pork shoulders, for curing, salt equalization, and drying (or aging). A shorter time period can be used for pork shoulders

because of the difference in shape and smaller size of the pork shoulders. These procedures, coupled with the usual applications of salt and cure and an 18% shrink from fresh weight, seem to produce a product which has characteristics approximating those traditionally expected, and which has gained wide recognition and acceptance as being country cured.

The agency then revealed its plan to require that those products not subjected to a substantial aging process be marketed not as "country" or "Country style" but as "dry cured:"

> Some hams and pork shoulders are prepared using procedures that are very similar to those proposed herein for country cured products, but differ primarily in drying (aging time). Since such products could not be called "country" or "country style", the Department proposed that they could properly and accurately be called "dry cured hams" or "dry cured pork shoulders," as the case may be.

Thus the agency proposed combined curing and salt equalization periods of not less than 45 and 25 days for "country" or "country style" hams and pork shoulders, respectively, and a total time for curing, salt equalization, and drying of not less than 70 and 50 days, respectively. In addition, for products dried under controlled conditions, the internal temperature of the product could not exceed 95° F.[3]

For hams and pork shoulders labeled "dry cured," on the other hand, the combined curing and salt equalization periods were once again 45 and 25 days, but the total periods (including drying) were set at only 55 and 40 days.

The final standard was published on January 18, 1977. (Federal Register, Vol. 42, No. 12 at 3298). The agency noted that some 203 comments were received in response to the third proposal: 158 favoring the proposal and 45 objecting to all or some provision contained therein. With only a

---

**3.** The exception for processors drying under natural atmospheric conditions represented an acknowledgement that natural temperatures could exceed this limitation during summer months in certain states.

minor clarification concerning the provision allowing internal temperatures during drying to exceed 95° F. under natural atmospheric conditions, the third proposed regulation was adopted and made effective as of July 1, 1978.

## A. The 95° F. Limitation

■ Some maximum temperature limitation is necessary to prevent the destruction of natural enzymes needed for flavor development in the pork product. Plaintiff concedes this principle but contends that satisfactory hams can be produced under somewhat higher smoking and drying temperatures.

Though mindful of the limited judicial scrutiny appropriate here, the Court finds inadequate the evidence adduced thus far to support the 95° provision. While the majority of responses during the rule-making process expressed approval of this limitation, a substantial disagreement was also evidenced. A rational basis exists only when the agency has based its determination on a consideration of the relevant factors. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). This would involve more than considering responses to proposed regulations. The factors and criteria necessary to facilitate accurate decision-making will not always be brought to light by those parties who choose to express their views on a proposed administrative action.

In the present case, the agency apparently failed to attempt to obtain evidence in at least three important areas. First, the administrative record is conspicuously deficient in scientific or experimental data.

Since the temperature prescription was primarily based on a scientific principle—that enzymatic activity is prevented at higher temperatures—popular opinion was of questionable value in identifying the precise temperature beyond which enzyme activity is inadequate.[4]

Second, USDA apparently made no attempt to compare current processing practices with more "traditional" or longstanding procedures. Since the rule-making process was initiated as a result of charges that product quality was being diluted by cheaper production techniques utilizing shorter time periods and higher temperatures, some consideration of the extent to which traditional practices have in fact been modified would seem to have been of considerable importance. In this regard, plaintiff alleges that the time and temperature specifications it is presently using are the same as those it was using forty years ago. If those processors who do not comply with the new USDA standards are simply using procedures which they have utilized for years and with which their customers are apparently satisfied, the validity of the specific standards promulgated by the agency may be substantially undermined.

Third, USDA made no attempt to obtain consumer reaction and comment beyond the very few who responded during the comment period. Since the exclusive purpose of the regulation in dispute is to provide *consumers* with a minimum taste quality in country hams, some attempt to investigate consumer preferences and expectations would appear to have been appropriate.[5]

The only effort apparently made by USDA to obtain evidence beyond the re-

---

4. A number of scientific experiments measuring the effect of temperature during the smoking and drying of country hams have been conducted. *See, e. g.,* J. Kemp, W. Moody, and J. Goodlet, *The Effects of Smoking and Smoking Temperatures on the Shrinkage, Rancidity Development, Keeping Quality, and alatability of Dry Cured Hams.* 15 Food Technology 267 (1961); L. Baker, *Electric Meat Aging Cabinet Progress* Report No. 1, Agricultural Engineering Development Dept., Tennessee Valley Authority; W. Hunt, W. Supplee, D. Meade, and B. Carmichael, *Qualities of Hams and Rapidity*

of Aging as Affected by Curing and Aging, Md.Agr.Exp.Sta.Bul. 428:31 (1939); G. Skelly, J. Kemp, and W. Varney, Article in 23 J.Am. Science 633 (1964). These studies, many of which included consumer taste panels, concluded that acceptable country hams may be produced at varying temperatures up to 110° and with varying aging periods.

5. As indicated, some studies of consumer preference have already been conducted. *See* note 4 *supra.*

sponses submitted during the comment period,[6] which tended merely to express agreement or disapproval and afforded little scientific or experimental support, was a "survey" or procedures utilized by a sample of processors in several southeastern states.[7] With respect to the 95° provision, the survey indicates that the substantial majority of processors sampled utilized procedures that could comply with this temperature limitation, except in Virginia, where a significant number of processors exceeded 95°.[8]

As plaintiff points out, however, this survey is of little, if any, value. The questionnaires submitted to processors simply requested that they indicate the temperature employed during smoking and/or drying without specifying whether minimum or maximum temperatures were desired. In addition, these questionnaires were not distributed by the agency in connection with the rule-making process currently in dispute, but had been submitted by processors earlier as part of the agency's supervision of trichinae treatment. Although an affidavit by a USDA official contends that the temperatures submitted were "actual" temperatures, the affidavit concedes some possible variance. Moreover, since the Department's trichinae regulations impose minimum temperature requirements, processors may have provided only minimums rather than actual or average temperatures. In any event, this possible confusion undermines the value of the survey and highlights the inadequacy of the agency's investigative efforts.[9]

In light of the absence of evidence that the agency considered several crucial factors and in view of the fact that large numbers of successful processors in certain regions of the country currently utilize temperatures in excess of 95° in smoking and drying their products, the court finds that this provision is not supported by a rational basis for the reasons stated.

B. *Time Limitations*

(1) *Curing and Equalization Period*

The minimum time periods contained in § 319.106 are also undermined by the agency's failure to seek out and consider relevant evidence. With respect to the curing and equalization standard, the agency began with a fifty day figure, apparently on the recommendation of the North Carolina group of processors. During the rule-making period, the opposing factions apparently reached a compromise position that forty days should be the minimum period.[10] This compromise apparently reflected existing practices; a very substantial percentage of processors sampled by the agency survey utilized a curing and equalization period of between forty and forty-four days. Indeed, a significant number indicated a period of precisely forty days. This was true not only in Virginia, but in other survey states.

In light of the forty-day compromise position and the survey evidence that numerous processors utilized this figure, the agency's decision to choose a longer period is capri-

---

**6.** If USDA utilized additional information, the record filed in this Court does not reflect it.

**7.** The survey was based on information provided by 230 processors in Virginia, North Carolina, Kentucky, Tennessee, and Georgia.

**8.** Plaintiff has suggested that the provisions of § 319.106 discriminate against processors from Virginia and other areas in favor of those from North Carolina. Although this contention is probably exaggerated, it appears from the record that North Carolina processors did by far the most effective lobbying during the rule-making process. As a result, the agency may have failed to give proper consideration to regional variations in ham processing.

**9.** Plaintiff asserts that a further inadequacy in the agency's survey was its failure to take into consideration the volume of pork products produced by those processors responding. Although a survey that ignores volume may have some validity, plaintiff's point is well-taken. As the agency concedes, the minority of survey respondents whose procedures don't comply with the requirements of § 319.106 may produce far more hams than the numerical majority.

**10.** *See* interagency memorandum of May 9, 1975, entitled "Position Paper."

cious and arbitrary unless based upon other relevant evidence.[11] As indicated above, the record filed in this Court is virtually devoid of such evidence.

### (2) *Aging Periods* [12]

Section 319.106 contains no express aging period minimum. For "country" hams, the processor must cure and allow salt equalization for at least 45 days, and must allow at least 70 days total for curing, salt equalization, and aging. In the case of hams to be labeled "dry cured," the figures are 45 days and 55 days, respectively. This regulatory scheme is clearly premised on the supposition that the difference between "country" products and "dry cured" products lies in the greater aging periods needed to produce "country" products. *See* 40 Fed.Reg. 173, at 41140. In its attempt to implement this premise, however, the agency appears to have chosen figures unsupported by rational evidence.

Since the regulation contains no minimum aging period, it is possible for a processor to market a "country" ham without having dried it for even a single day, so long as his curing and salt equalization period is at least 70 days. Similarly, it is conceivable for a ham that must be marketed as "dry cured" to have been dried (aged) for a longer period than a ham that may be labeled "country."

It may be contended, of course, that an extended curing and equalization period serves the same function as an aging period. Whether or not such a contention is viable is unclear, but to the extent that § 319.106 contains an implicit aging period of 25 days for "country" products, it is not rationally supported by the record now before the Court.

The agency survey indicates the great diversity in aging periods employed by processors in different regions. Particularly in Virginia, Tennessee, and Georgia, processors apparently have not been aging their products for the 25 day period arguably implicit in § 319.106(5). This disparity was acknowledged by USDA in the explanation accompanying the second proposed standard, which contained no minimum aging period.

More importantly, intra-agency memoranda reveal the absence of an adequate evidentiary basis for the imposition of a 25 day minimum. In a memorandum dated October 6, 1972, to L. V. Sanders, Acting Director of Technical Services for USDA, W. J. Minor, Chief of the Product Standards Staff, stated that

> we have received no substantive information indicating that our original position on the length of the "aging" period, as referred to in the first proposal on the products, should be changed. That is, it is apparent from information we have available, that a significant portion of the total "country" hams and pork shoulders that have been produced in this country have been subjected to "aging" (drying) periods of less than 30 days. We concluded, therefore, it would be unrealistic to insist on a 30-day "aging" period in view of this production background.

In a follow-up memorandum on October 31, 1972, Dr. Minor concluded that the 18% shrinkage requirement and the 95° F. temperature maximum coupled with curing and salt equalization requirements would

---

11. Because of the potential economic disruption caused by the promulgation of a standard of identity, such a standard should express no more than the minimum level necessary to satisfy consumer expectation and thus avoid economic adulteration. *See* Forte, *Definitions and Standards of Identity for Food*, 14 U.C.L.A. L.Rev. 796 (1967). The agency's decision to prescribe a forty-five day rather than a forty day period, in the absence of other supporting evidence, appears to have been a concession to the North Carolina lobby in exchange for the agency's decision to incorporate an implicit

twenty-five day aging period rather than the thirty day period which that group had contended was an absolute necessity, in the absence of which they would institute litigation. *See* text *infra*.

12. If the curing and salt equalization period is finally determined to be arbitrary, the total processing period minimums may necessarily fall. This section nevertheless undertakes separate consideration of the regulation's implicit aging period.

produce a characteristic "country" product without a minimum aging period. He further stated that "while the North Carolina processors claim a minimum of 30 days aging is required for a desirable taste in a "country" pork product, the real reason is the matter of meeting comparative pricing structures."

Six months later, no new evidence necessitating an aging period minimum had been received. In a memorandum to Donald L. Houston, Director of Technical Services, on April 26, 1973, Dr. Minor reiterated that

the lack of a definite time limitation on this portion of the processing operation in the proposed standard of last July [1972] was based on the fact that a significant proportion of the "country" pork products produced in this country are not "aged" for 30 days, yet are readily accepted by consumers in many markets as "country."

This memorandum also noted that certain representatives of the North Carolina industry had indicated that they would institute litigation if the final standard failed to include a minimum aging period of at least 30 days.

On June 20, 1973, a memorandum labeled "For Official Use Only" was circulated addressing the aging period controversy. This memorandum stated that the opposing factions remained adamant and that "Congressional pressure has been exerted and will likely intensify in next several months." The document concluded that "it would appear that USDA has no choice but to decide the "aging period matter on basis of best information available and publish the standard."

A memorandum to the file authored by Dr. Minor on February 20, 1974, indicates that the controversy had not lessened and that no new information or evidence had been received. An agency position paper of May 9, 1975, further indicates that the situation remained unchanged. This document also states that media coverage of the controversy had implied that USDA was attempting to destroy the "old country ham."

This series of memoranda conveys an accurate account of the arbitrary decision-making process underlying the adoption of the final aging periods first published on September 5, 1975. Although the agency had been unable to acquire evidence or information affording the basis for logical resolution of the controversy, it felt compelled by Congressional and media pressure to make a decision. No industry or consumer consensus existed on the question and the small amount of "scientific" data was inconclusive.[13] Nevertheless, the agency arbitrarily chose to adopt a standard containing an implicit 25 day aging period.

### III. *Conclusion*

Since the agency's decision to promulgate the temperature and time period provisions contained in § 319.106 are not adequately supported by the record presently before the Court, the agency must, if it can, supply additional explanation and support for these provisions. *See Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *National Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688, 701 (2d Cir. 1975). Any further documentation or evidence should be provided within a reasonable time. The parties will submit their suggestions as to a reasonable period necessary for this purpose.

It is so ORDERED this 21st day of July, 1980.

---

**13.** The North Carolina contingent did offer the result of tests conducted by staff members at North Carolina State University which indicated that consumers preferred products aged for at least 30 days. As noted in an intra-agency memo addressing this "evidence," however, the North Carolina taste panel undoubtedly represented the tastes of North Carolinians and not necessarily those of consumers throughout the country. Memorandum of June 24, 1973, labeled "North Carolina Research on Country Ham." This memo further notes that flavor development might be accelerated at higher temperatures up to 95°–100° F. beyond which adverse flavor effects may occur.