ESCONDIDO MUTUAL WATER COMPANY, City of Escondido, and Vista Irrigation District, Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

San Pasqual Band of Mission Indians, Secretary of Interior, etc., et al., Intervenors.

SAN PASQUAL, LA JOLLA, RINCON, PAUMA AND PALA BANDS OF MISSION INDIANS, Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Escondido Mutual Water Company, City of Escondido and Vista Irrigation District, Intervenors.

The SECRETARY OF the INTERIOR, acting in his capacity as trustee for the Rincon, La Jolla and San Pasqual Bands of Mission Indians, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Escondido Mutual Water Company, City of Escondido and Vista Irrigation District, Intervenors.

Nos. 79–7625, 80–7012 and 80–7110.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 6, 1982.

Decided Nov. 2, 1982.

As Amended Feb. 23, 1983.

As Amended on Denial of Rehearings March 17, 1983.

See 701 F.2d 826.

Paul D. Engstrand, Leroy A. Wright, San Diego, Cal., James C. Kilbourne, Washington, D.C., Robert S. Pelcyger, Boulder, Colo., argued, for petitioners; Jennings, Engstrand & Henrikson, Glenn, Wright, Jacobs & Schell, San Diego, Cal., C. Emerson Duncan, II, Duncan, Allen & Mitchell, Washington, D.C., on brief, for Escondido; Raymond N. Zagone, Dirk D. Snel, U.S. Dept. of Justice, Daniel M. Rosenfelt, Dept. of the Interior, Washington, D.C., on brief, for Interior; Fredericks & Pelcyger, Boulder, Colo., on brief, for San Pasqual, etc.

Joseph S. Davies, Jr., Joshua Rokach, FERC, Washington, D.C., argued, for respondent; John A. Cameron, Acting Asst. Sol., Kristina Nygaard, FERC, Washington, D.C., on brief.

Petition for Review of Orders of the Federal Energy Regulatory Commission.

Before ANDERSON, FERGUSON and NELSON, Circuit Judges.

FERGUSON, Circuit Judge:

This is a petition for review of decisions of the Federal Energy Regulatory Commission ("Commission")[1] in consolidated ad-

---

1. The term "Commission" is used throughout this opinion to refer to the Federal Power Commission before October 1, 1977, and to the Federal Energy Regulatory Commission after

ministrative proceedings involving licensed Project No. 176 in northern San Diego County, California. The project was originally licensed for 50 years in 1924 to the Escondido Mutual Water Company ("Mutual") pursuant to Part 1 of the Federal Power Act ("FPA"), 16 U.S.C. § 791a *et seq.* (1976). Since 1974, the project has been operated under annual licenses issued pursuant to section 15(a) of the FPA, 16 U.S.C. § 808(a) (1976). The proceedings now under review culminated in the issuance of a new 30-year license to Mutual, the City of Escondido ("Escondido"), and the Vista Irrigation District ("Vista").

The decision of the Commission to issue a new license to Mutual, Escondido, and Vista is reflected in its unreported Opinion No. 36, "Opinion and Order Issuing New Licenses, Determining Annual Charges for Past Periods, Prohibiting Certain Activities, Conditionally Providing Interim Operating Procedures, and Terminating Complaint and Investigatory Proceedings," issued February 26, 1979, and No. 36–A, "Opinion and Order on Rehearing Modifying Licenses and Stay, Determining Net Investment and Severance Damages, and Otherwise Denying Rehearing," issued November 26, 1979. Judicial review of these orders is sought by the Secretary of the Interior ("Interior"), Mutual, Vista, Escondido, and the San Pasqual, La Jolla, Rincon, Pauma, and Pala Bands of Mission Indians ("Bands").

For the reasons given below, we reverse the Commission's decision and remand for further proceedings.

FACTS

The San Luis Rey River originates near Palomar Mountain in northern San Diego County, California. In its natural condition, it flows through the La Jolla, Rincon and Pala Indian Reservations, and then through the City of Oceanside on its way to the Pacific Ocean. Three other Indian reservations are also within the watershed of the San Luis Rey River—the Pauma, Yui-

ma,[2] and approximately three-quarters of the San Pasqual. A map of the area and of Project No. 176, Appendix A of the Commission's Opinion No. 36, appears as Appendix I to this opinion.

The San Luis Rey River watershed is now and has historically been the homeland of the La Jolla, Rincon, San Pasqual, Pauma, Pala, and Yuima Bands of Mission Indians. These Indians were the object of Congress's special attention when it enacted, in 1891, the Mission Indian Relief Act ("MIRA"), 26 Stat. 712. Some of the concerns that led to the enactment of MIRA were expressed by the preceding Congress:

> The history of the Mission Indians for a century may be written in four words: conversion, civilization, neglect, outrage. The conversion and civilization were the work of the mission fathers previous to our acquisition of California; the neglect and outrage have been mainly our own. Justice and humanity alike demand the immediate action of Government to preserve for their occupation the fragments of land not already taken from them.
>
> \*   \*   \*   \*   \*   \*
>
> Much of the land is valueless without irrigation, and the Indians are being deprived of their water rights wherever and whenever the interests of the whites demand the appropriation of such rights.

S.Rep. No. 74, 50th Cong., 1st Sess. 1, 3 (1888).

Pursuant to the provisions of MIRA, the La Jolla, Rincon, San Pasqual and Pala Reservations were withdrawn from settlement and entry by order of President Harrison on December 29, 1891. Trust patents were issued on September 13, 1892, for the La Jolla and Rincon Reservations; on February 10, 1893, for the Pala Reservation; and on July 1, 1910, for the San Pasqual Reservation. The Pauma and Yuima Reservations were also established in accordance with MIRA through the acquisition of quitclaim deeds by the United States in

that date. *See* 42 U.S.C. §§ 7172(a)(2), 7295(b) (Supp. IV 1980); 10 C.F.R. § 1000.1(d) (1982).

**2.** The Yuima tracts are under the jurisdiction of the Pauma Band of Mission Indians. Consequently, while there are six reservations, there are five governing Indian bands.

1891 and 1893. MIRA originally called for the land to be held in trust for 25 years, followed by the issuance of fee patents, but the periods of trust were later extended indefinitely.

Since 1895, the waters of the San Luis Rey River have been diverted out of the watershed to the community in and around the City of Escondido. The point of diversion has been located in the middle of the La Jolla Indian Reservation above all of the other reservations. The conveyance facility, known as the Escondido Canal, traverses parts of the La Jolla, Rincon and San Pasqual Reservations, as well as some private lands and some federal land administered by the Bureau of Land Management. Its terminus is a storage facility known as Lake Wohlford.

Various agreements, dating back as far as 1894, among Mutual's predecessor, Interior, and the Bands purport to grant rights-of-way for the Escondido Canal across the various reservation lands in return for a guarantee to supply certain amounts of water to the Bands. The validity of those agreements is the subject of separate, currently pending litigation between Mutual and the Bands. *Rincon Band of Mission Indians, et al. v. Escondido Mutual Water Co., et al.*, S.D. Cal. Nos. 69–217–S, 72–276–S, 72–271–S. In a partial summary judgment in that action, certain portions of those agreements were declared void. *Id.* (January 10, 1980).

The diversion and conveyance facilities, including the diversion dam on the La Jolla Reservation, the Escondido Canal, and the various appurtenant roads, pack trails, power lines, telephone lines and the like, and two hydroelectric generating stations have been licensed to Mutual under Project No. 176 since 1924.

In 1922, Vista's predecessor constructed Henshaw Dam on the San Luis Rey River, approximately nine miles above Mutual's diversion dam. Pursuant to a complex contractual relationship, Vista .and Mutual have shared the output of Lake Henshaw and the use of the Escondido Canal. Since 1925, approximately one-half of the water transported through the Escondido Canal and stored in Lake Wohlford has been delivered to the community in and around the City of Vista and the other half has been diverted to Escondido. The Henshaw facilities and water rights were not included in the original license for Project No. 176. Prior to 1979, Vista and its predecessors were not licensed by the Commission or mentioned in the license.

Since 1925, Escondido and Vista have captured, impounded and diverted out of the watershed to Lake Wohlford approximately 90% of the flow of the San Luis Rey River at the diversion dam on the La Jolla Reservation. This amounts to an average of approximately 14,600 acre-feet per year. Natural flow accounts for only 2,705 acre-feet of the average annual diversion, the remainder consisting of water stored in Lake Henshaw, and water pumped from the groundwater basin above Lake Henshaw. Approximately 10% of the diverted flow, an average of 1,500 acre-feet per year, has been delivered to the Rincon Reservation pursuant to a 1914 contract entered into by Interior on behalf of the Rincon Band. No project water has been delivered to any of the other reservations. An average of approximately 2,200 acre-feet per year has flowed past the diversion dam, for one of two reasons: either the flows in the river have exceeded the capacity of the diversion facilities, or the facilities have been shut down for periodic maintenance and repair.

The Bands and Interior contend that the diversion of the San Luis Rey River water through Project No. 176 has substantially diminished recharge of the downstream Pauma, and Pala groundwater basins which underlie the Rincon, Pauma and Pala Reservations, and that as a result wells have gone dry and crops have been destroyed. The Bands and Interior also assert that "the future development of these reservations is dependent upon the utilization of these groundwater resources."[3]

---

**3.** There was apparently no finding by the Commission or the A.L.J. with respect to these assertions. We express no view as to the degree to which they are supported by the record.

Between 1894 and 1957, the Bands received no compensation for the use of their lands or for the diversion of the river. Since 1957, the San Pasqual Band has received $25 per year for the use of 3.08 acres of tribal lands licensed in that year.

## PROCEEDINGS

On July 25, 1969, the Rincon and La Jolla Bands sued Mutual, Escondido, Interior, and the United States in the federal District Court for the Southern District of California. *Rincon Band of Indians v. Escondido Mutual Water Co., supra,* Nos. 69–217–S, 72–276–S, and 72–271–S. The Bands sought (1) a declaratory order that various water and right-of-way agreements between Mutual, Vista and the Bands were void, (2) an injunction prohibiting the diversion of the San Luis Rey waters into the Escondido Canal, and (3) substantial damages. In January 1980, the district court granted partial summary judgment in favor of the Bands by voiding portions of the contracts. On April 18, 1980, this court denied petitions for interlocutory appeal filed by the parties.

In 1969 and 1970, Interior and the La Jolla, Rincon, and San Pasqual Bands filed complaints with the Commission, alleging that Mutual and Vista had violated the terms of the 1924 license. Among other things, they sought increased annual payments to the Bands throughout the term of the 1924 license. The Commission initiated an investigation, Docket No. E–7562, pursuant to § 306 of the Federal Power Act, 16 U.S.C. § 825e (1976).

In April 1971, Mutual filed an application, subsequently joined by Escondido, for a new "minor"[4] hydroelectric license for Project No. 176, proposing to continue operating the project as it had during the original license period. In July 1971, the Commission initiated an investigation to consider the extent to which Vista was involved in the operation of Project No. 176 and in the occupancy of Indian lands or other lands of the United States (Docket No. E–7655).

In May and October 1972, Interior requested that the Commission recommend federal takeover of Project No. 176, after expiration of the original license, under section 14 of the Federal Power Act, 16 U.S.C. § 807 (1976). In June 1972, the La Jolla, Rincon, and San Pasqual Bands, acting pursuant to § 15(b) of the Federal Power Act, 16 U.S.C. § 808(b) (1976), applied for a non-power license, under the supervision of Interior, to become effective when the original license expired. This application was later joined by the Pauma and Pala Bands. Under both the federal takeover proposal and the Bands' application for a nonpower license, the licensed facilities would be used almost exclusively for agricultural and recreational development of the Reservations, not for the generation of electricity.

Lengthy hearings were thereafter held before an administrative law judge. He found that Project No. 176 was not constructed or operated for the purpose of generating electricity and that the Commission was therefore without jurisdiction to license it. Accordingly, he recommended dismissal of Interior's complaint, the Vista investigation, and all license applications, including Interior's recapture proposal. If this ruling had remained undisturbed, the consequence would have been that any rights-of-way purportedly conveyed by the original license would have reverted to the Bands once that license expired.

In February 1979, in Opinion No. 36, the Commission reversed the Initial Decision insofar as it dismissed new license applications, but affirmed that decision on the termination of Interior's complaint proceeding and the Vista investigation. The Commission held that Project No. 176 is subject to its licensing jurisdiction.

---

**4.** Section 10(i) of the Federal Power Act, 16 U.S.C. § 803(i) (1976), allows the Commission to waive conditions in Part I of the Act for a complete project with not more than 2,000 horsepower capacity. Project No. 176, as licensed, falls below that limit.

With regard to the past operation of Project No. 176, the Commission found that Mutual had violated the license by permitting Vista's joint use of project facilities and by diverting water stored in the Lake Henshaw reservoir owned by Vista and pumped from that reservoir through the Escondido Canal. Consequently, the Commission awarded readjusted annual charges to the La Jolla and Rincon Bands as of September 1969, and to the San Pasqual Band as of May 1970, in amounts based on the operations authorized by the 1924 license. The Commission held that any retroactive compensation for unauthorized use of reservation lands, however, had to be obtained in federal district court.

The Commission granted a new 30-year license authorizing use and control of the project by Mutual, Escondido, and Vista. It imposed conditions on the license which require the delivery of water to the La Jolla, Rincon, and San Pasqual Reservations for domestic, agricultural, and commercial uses. Those conditions were assertedly imposed to ensure that the project would not interfere or be inconsistent with the purpose for which these reservations had been created. No similar conditions were imposed with respect to the Pala, Pauma and Yuima Reservations because, although those reservations lie within the San Luis Rey River watershed below the intake of the Escondido Canal, and are thus affected by the diversion of water into Project No. 176, none of those reservations is traversed by the canal.

Among the conditions included in the new license for the benefit of the Bands are the following:

1. The license will include Vista's Lake Henshaw facilities and a "permanent water operating plan . . . for the purpose of enhancing the existing fishery . . . and benefiting incidentally the Pauma and Pala Basins." The Commission asserts that this condition will assure, *inter alia,* an adequate water supply for the reservations.

2. The license is subject to reconsideration following the final disposition of the federal district court water rights litigation between the United States, Mutual, Vista and the Bands.

3. The license includes a formula determining annual charges for the use of lands within the La Jolla, Rincon, and San Pasqual Reservations, which, as modified by the Commission's opinion, awards approximately 11½ per cent of the project's net water conveyance benefits to the three reservations traversed by the canal. Also included is an additional annual charge to compensate the Rincon Band for the use of its land for generating power at the Rincon power plant.

4. The licensees are required to release water from the Escondido Canal, as ordered by the Commission, to an "Indian water service area" within the Indian reservations.

Pursuant to the duty imposed on him by section 4(e) of the FPA, 16 U.S.C. § 797(e) (1976), the Secretary of the Interior propounded a number of additional conditions to be included in the project license. The administrative law judge rejected the conditions on the ground they would "destroy the project." In its opinion, the Commission accepted some of the conditions but rejected or modified others because they would prevent the Commission from carrying out its licensing obligations.

In its November 1979 decision on Rehearing, Opinion No. 36–A, the Commission stayed the effective date of the new license for two years after the issuance of that opinion pursuant to section 14(b) of the FPA, 16 U.S.C. § 807(b) (1976). It gave the licensees until six months after the effective date of the new license to submit exhibits reflecting inclusion of the Henshaw properties, facilities and water rights within the licensed project and providing for a proposed permanent operating plan for the project.

The Commission also, for the first time, determined the amount of Mutual's net investment and the severance damages to which it would be entitled in the event of either federal recapture or issuance of the nonpower license to the Bands. It found

that the net investment has been fully depreciated and that there would be no severance damages because no electric utility properties of the licensee would be affected. Additionally, the Commission held that neither the United States nor any new licensees would be required to assume any of the licensee's contracts.

Finally, the Commission held that it had exclusive authority to issue right-of-way permits for the use of public lands for power project purposes. It concluded that section 501(a)(4) of the Federal Land Policy and Management Act, 43 U.S.C. § 1761(a)(4) (1976), did not require the licensees to obtain a right-of-way permit from the Secretary of the Interior.

All parties then filed petitions for review. No. 79–7625 was filed in this court on November 26, 1979 by Mutual, Vista, and Escondido. In it, the petitioners contend that the conditions imposed on the license are too stringent, and that the Commission's resolution of the annual charges, net investment and severance damages issues was unreasonably favorable to the Bands. No. 80–7012 was originally filed by the Bands in the United States Court of Appeals for the District of Columbia Circuit (D.C.Cir. No. 79–2397) on November 27, 1979. No. 80–7110 was originally filed by Interior in the D.C. Circuit on January 25, 1980 (D.C.Cir. No. 80–1111). The latter two petitions were transferred to this court by a January 29, 1980 order of the D.C. Circuit. In them, the Bands and Interior contend, among other things, that the Commission lacked jurisdiction to license Project No. 176, that the license cannot be issued without the consent of the Bands, that the Commission is required to include in the license the conditions propounded by Interior, that the conditions imposed upon the license by the Commission do not adequately protect the Bands' interests, that the Commission cannot grant rights-of-way across nonreservation federal lands under the jurisdiction of Interior without Interior's consent, and that the license is inconsistent with the purposes for which the reservations were created. All three petitions were consolidated by order of this court filed May 14, 1980.

## ISSUES

Of the numerous issues presented to us in the three petitions for review, we need only consider the following:

1. Does the Commission have jurisdiction to license Project No. 176?

2. Can the license be granted without the Bands' consent?

3. Can the license be granted without including all of the conditions propounded by Interior pursuant to the duty imposed upon it by section 4(e) of the FPA, 16 U.S.C. § 797(e) (1976)?

## DISCUSSION

### I. *The Commission's Jurisdiction.*

The Commission is authorized and empowered under the FPA to issue licenses

> for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient ... for the development, transmission, and utilization of power across, along, from, or in any of the streams or the bodies of water over which Congress has jurisdiction under its authority to regulate commerce.

Section 4(e) of the FPA, 16 U.S.C. § 797(e) (1976). At the same time, the FPA makes it unlawful "for any person, State, or municipality, for the purpose of developing electric power, to construct, operate, or maintain any dam, water conduit, reservoir, power house, or other works incidental thereto ... except under ... a license granted pursuant to this chapter." Section 23(b) of the FPA, 16 U.S.C. § 817 (1976). The Bands and Interior contend that under these provisions the Commission's licensing authority extends only to projects the purpose of which is the development of electric power. They contend that Project No. 176 is not such a project. Alternatively, they contend that the Commission's jurisdiction extends only to power components of projects with a primary purpose of diverting water, and with a secondary or incidental purpose of developing electric power.

The starting point for analysis is the observation that the primary purpose of Project No. 176 is not the development of power. The ALJ found that the project's "predominant and clearly defined purpose" is irrigation, not power production. The Commission agreed, stating that "the principal function ... is to convey water," Opinion 36 at 95, and that "[t]he generation of electric power is and always has been incidental to the primary purpose of the project," Opinion 36–A at 27. Indeed, the ALJ found that the horsepower generated by the project is "not even the equivalent to that produced by half a dozen modern automobiles," and concluded, in determining that the Commission was without jurisdiction to license the project, that "the production of power ... can only be termed *de minimis* ... especially in light of the miniscule amount of power produced, both in absolute terms and relative to other projects."

Interior and the Bands do not contend that power generation must be the primary purpose of the project for the Commission to have jurisdiction. Such a contention would be wholly at odds with precedent. Rather, they contend that in this case the power generation aspect of the project is pure makeweight—that it is only included for the purpose of conferring jurisdiction on the Commission.

The Commission did not reach this question, relying instead on a very expansive reading of sections 4(e) and 23(b) of the FPA:

> So long as any part of a project is situated on navigable waters, or on public lands or reservations, and so long as that project generates any electric power, however minor in amount and however insignificant to the project as a whole, and so long as interstate or foreign commerce is affected, the works of that project are subject to be licensed and required to be licensed under the Federal Power Act.

Opinion No. 36, at 37–39 (footnotes omitted).

We are required to give great deference to interpretations by administrative agencies of the statutes they are required to administer. *Investment Co. Institute v. Camp*, 401 U.S. 617, 626–27, 91 S.Ct. 1091, 1096–1097, 28 L.Ed.2d 367 (1971); *Sierra Club v. Andrus*, 610 F.2d 581, 602 (9th Cir. 1979), *reversed on other grounds*, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981). This principle applies to an agency interpretation of the scope of its authorizing statute. *Peters v. Hobby*, 349 U.S. 331, 345, 75 S.Ct. 790, 797, 99 L.Ed. 1129 (1955); *Tennessee Valley Ham Co. v. Bergland*, 493 F.Supp. 1007, 1010 (W.D.Tenn.1980). The question before us, therefore, is whether the interpretation of section 4(e) put forth by the Commission is a reasonable one.

The FPA empowers the Commission to license projects "for the development, transmission and utilization of power," section 4(e) of the FPA, and requires licenses to be obtained by persons who construct, operate, or maintain facilities "for the purpose of developing electric power," section 23(b) of the FPA. No explicit language in the FPA limits the Commission's jurisdiction to projects where the primary, or a major, or significant, or non-*de minimis* purpose is to generate power. Thus, the broad interpretation advanced by the Commission is not inconsistent with the plain language of the statute, even though that language might equally well have been subject to a narrower interpretation.

Nor did the Commission, by applying its broad interpretation of the jurisdictional statute to the facts of this case, act so unreasonably as to require reversal. This case, unlike one that might someday arise, does not squarely present the question whether the Commission could properly apply its broad jurisdictional formula to a case where the power elements of the project were included as "mere sham and makeweight." There was no such finding in this case, and we decline to make one ourselves at this stage of the proceedings. It suffices merely to note that there must be some point beyond which the mere presence of a power generating element in a much larger

project aimed at a different goal could not reasonably be thought to confer jurisdiction on the Commission over the whole project. Where such a line ought to be drawn, in the first instance, is a question for the Commission rather than for this court. We are not persuaded at this point in the proceedings that the line has been crossed in this case, and we therefore decline to overturn the Commission's assertion of jurisdiction.

Interior and the Bands also assert that at any rate the Commission's jurisdiction is limited to the "power components" of the project. We find no error in the Commission's conclusion, supported by the findings of the A.L.J., that all of the licensed facilities are "physical structures" which "are used and useful in connection with" the power elements of the project, and therefore within the scope of the Commission's jurisdiction. *See* section 3(11) of the FPA, 16 U.S.C. § 796(11) (1976).

## II. *Indian Consent.*

As already noted, Project No. 176 involves various dams, ditches, flumes, powerhouses, and canals, which occupy parts of the Rincon, La Jolla, and San Pasqual Reservations. All three reservations were established pursuant to the provisions of the Mission Indian Relief Act of 1891 ("MIRA"). Section 8 of MIRA provides in pertinent part:

> [P]revious to the issuance of a patent for any reservation as provided in section three of this act the Secretary of the Interior may authorize any citizen of the United States, firm, or corporation to construct a flume, ditch, canal, pipe, or other appliances for the conveyance of water over, across, or through such reservation for agricultural, manufacturing, or other purposes, upon condition that the Indians owning or occupying such reservation or reservations shall, at all times during such ownership or occupation, be supplied with sufficient quantity of water for irrigating and domestic purposes upon such terms as shall be prescribed in writing by the Secretary of the Interior, and upon such other terms as he may pre-

scribe .... *Subsequent to the issuance of any tribal patent,* or of any individual trust patent as provided in section five of this act, any citizen of the United States, firm, or corporation may contract with the tribe, band, or individual for whose use and benefit any lands are held in trust by the United States, for the right to construct a flume, ditch, canal, pipe, or other appliances for the conveyance of water over, across, or through such lands, which contract shall not be valid unless approved by the Secretary of the Interior under such conditions as he may see fit to impose.

(Emphasis added). The Bands and Interior maintain that under this section the Commission may not license those parts of Project No. 176 which occupy reservation land without the consent of the respective Indian Bands. The Commission disagrees.

### A. Does Section 8 of MIRA Require Indian Consent?

Trust patents were issued on September 13, 1892, for the La Jolla and Rincon Reservations, and on July 10, 1910, for the San Pasqual Reservation. Thus, the relevant part of the statute is the latter part, which by its terms applies "[s]ubsequent to the issuance of any tribal patent." The language of the statute appears on its face to be comprehensive in prescribing the ways in which private parties can obtain rights-of-way for water projects across Mission Indian Reservations. Interior and the Bands contend that the statute means just what it appears to mean in this respect, and that it was not superseded, repealed, or limited by the congressional grant of licensing authority to the Commission under the FPA. The Commission contends, on the other hand, that § 8 of MIRA does not provide the exclusive means by which a private party can obtain such a right-of-way, or that if it does, it has been repealed implicitly to that extent by enactment of the FPA.

We begin analysis by considering the scope of MIRA as originally enacted. That question is illuminated by understanding the legal background from which

MIRA emerged. Indian tribes generally possess sovereign power within their reservations, including among other facets of self-government and territorial management the authority to control economic activity within their jurisdiction, and the power to exclude non-Indians from tribal lands. *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 137, 102 S.Ct. 894, 901, 71 L.Ed.2d 21 (1982). Similarly, it has long been held that a tribe's title to its lands cannot ordinarily be extinguished without tribal consent. *See Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 665, 99 S.Ct. 2529, 2536, 61 L.Ed.2d 153 (1979); *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831).

■■ Of course, the congressional power of eminent domain remains paramount, and can be exercised by Congress over tribal lands, just as it can be exercised over the lands of any private landowner within the jurisdiction of the United States. Congress can and often does delegate the power of eminent domain to various federal agencies. Ordinarily, however, it does not do so in the case of Indian lands; a special act of Congress is required when such lands are to be condemned. This point was highlighted recently when new regulations were proposed that would have given Interior the power to issue rights-of-way across certain tribal lands (not those involved in the instant case) without the Indians' consent. In commenting on these proposed regulations, the House Committee on Government Operations said:

> Present law generally requires a special act of Congress to condemn tribal Indian land. If there are frequent instances of Indian tribes unreasonably refusing to consent to the Secretary's granting of rights-of-way over their land which are essential to the fulfillment of public purposes and the public welfare, then Congress might consider enacting legislation authorizing the person or agency seeking the right-of-way to institute a suit for condemnation thereof in a federal court.

H.R. Rep. No. 78, 91st Cong., 1st Sess. 9–10 (1969). With respect to the proposed regulations, the Committee said this: ·

> The Committee believes that the Secretary's proposal for granting rights-of-way over tribal land without the consent of the tribe which owns it violates property rights, democratic principles, and the pattern of modern Indian legislation.

> The Committee believes that the Secretary's assertion of power to act in disregard of his own regulation and issue rights-of-way over lands of tribes that have withheld their consent to such grants is contrary to law, as well as to good government, and should not be entertained.

*Id.* at 3–4.

These general principles are wholly consistent with Congress's purpose in including section 8 when it enacted MIRA, as the legislative origin of that section reveals. Shortly before the passage of MIRA, several irrigation companies sought rights-of-way across Indian land. Interior believed that the proposed irrigation ditches and flumes would benefit the Mission Indian Bands across whose lands they were to run. But Interior concluded that it was without power to grant the rights-of-way. That conclusion was based on an 1887 opinion of the Attorney General, which addressed the identical question. The Attorney General had said:

> It is stated the diversion of the water and the right to dig the canal or ditch would be useful to the petitioners and beneficial in its effect to the Indians. These same facts exist in many cases where one man could use his neighbor's property with advantage both to himself and his neighbor; but still, as a rule, it is better to maintain the rights of property under the law.

> ·· · · ·

> Attorney-General Devens, in an opinion reported in 16 Opinions, page 553 (in which I concur), maintained that the United States had power to grant such privileges as are asked for by the petitioner in this case; but the power to make the grant exists only in Congress, .

and without action by Congress it cannot be lawfully exercised.

18 Op. Att'y Gen. 563, 563–64 (1887).

In order to enable the Indians and the surrounding settlers to benefit from the construction of irrigation canals across reservation land, the Secretary of the Interior proposed that the pending legislation be amended to provide a mechanism for granting rights-of-way. The proposed amendment was identical to the later enacted section 8 except that it lacked the requirement that pre-patent grants guarantee a supply of water to the Indians for irrigation and domestic purposes. The proposed amendment was added to the bill as section 8 on the House floor. 22 Cong.Rec. 311–13 (1890). The Senate conferees agreed to the amendment with the addition of the requirement just mentioned, and with this modification, the bill enacting MIRA was passed.

■ The legislative history of section 8 makes clear that, at the time of its passage, Congress and Interior believed that federal agencies[5] could not grant rights-of-way without specific authorization from Congress. In section 8, Congress carefully limited the scope of that authorization which it was willing to grant. Unless implicitly repealed by later legislation, section 8 represents the only way in which a private party may obtain a right-of-way across reservations created pursuant to MIRA.[6]

The Commission takes the position that section 29 of the FPA, 16 U.S.C. § 823 (1976), repeals section 8 of MIRA to whatever extent section 8 of MIRA comes into conflict with the Commission's asserted power to grant rights-of-way across reservations under its licensing authority. Section 29 provides, in pertinent part, that "[a]ll Acts or parts of Acts inconsistent with this Act are hereby repealed." However, the FPA explicitly requires the Commission, before issuing a license within any reservation, to find that "the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired." Section 4(e) of the FPA, 16 U.S.C. § 797(e) (1976). This requirement would be meaningless if Congress meant to extinguish preexisting Indian rights wherever they came into conflict with the Commissioner's comprehensive jurisdiction over power projects on federal lands. *See Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Federal Power Comm'n,* 510 F.2d 198, 210–12 (D.C.Cir. 1975).

We do not agree with the Commission that section 8 of MIRA and the FPA conflict. Section 8 of MIRA defines the way in which any private entity can obtain a right-of-way across a reservation to which it applies. The FPA authorizes the Commission to issue licenses for the construction and operation of power projects. Where a project requiring a license under section 23(b) of the FPA crosses lands to which MIRA applies, the operator of that project is required both to obtain a license from the Commission, and to obtain the necessary right-of-way by the method provided in section 8 of MIRA.

Out of respect for Indian property rights, laws establishing and governing the reservations here involved were enacted.[7] With-

---

**5.** Nor by the Indians themselves, since the United States held title to the lands. *See* 16 Op. Att'y Gen. 552, 556–57 (1880).

**6.** The Commission urges that section 8 of MIRA was not intended "to circumscribe the power of the United States, acting as sovereign, to dispose of public lands and reservations of the United States." We agree that it was not so intended. As we have explained, however, that sovereign power reposes in Congress, and may only be exercised by a federal agency to the extent of a specific congressional delegation. Section 8 of MIRA is thus not a limitation of the congressional power to dispose of

reservation lands, but a carefully conditioned and circumscribed delegation of that power to Interior, and to the Bands themselves.

**7.** When the Commission licenses a project crossing private lands, the licensee must obtain appropriate rights-of-way from the owners of those lands. This can be done by private negotiation or, failing that, through eminent domain. *See* section 21 of the FPA, 16 U.S.C. § 814 (1976). This simply recognizes that Congress did not intend to infringe property rights of private landowners in enacting the FPA. The property rights of Indian tribes within their reservations are of similar importance.

out strong indications of congressional intent, we will not attribute to Congress a desire to abandon those principles, and repeal those laws, by enacting the FPA.

### III. *The Rejection of Interior's Conditions.*

Section 4(e) of the FPA, 16 U.S.C. § 797(e), provides, in pertinent part, that

> licenses issued within any reservation . . . shall be subject to and contain such conditions as the Secretary of the Department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation.

*Id.* It is not disputed that, with respect to the reservation lands involved here, the "Secretary of the Department under whose supervision such reservation falls" is the Secretary of the Interior. Pursuant to this section, Interior proposed a number of conditions to be placed on the license granted by the Commission. Many of these proposed conditions were rejected or modified by the Commission. We thus confront the issue whether the Commission violated section 4(e) by issuing a license "within Indian reservations" that neither "contained" nor was "subject to" some of the conditions which Interior "deemed necessary for the adequate protection and utilization of the reservation."

The language of the statute appears quite plain on its face. The license "shall include and be subject to" such conditions as Interior "deems necessary." The Commission contends, however, that it is not bound to accept Interior's conditions because section 10(a) of the FPA imposes upon the Commission a duty to exercise its independent judgment as to what conditions are "best adapted to a comprehensive plan for improving or developing a waterway, . . . for the improvement and utilization of waterpower development, and for other beneficial public uses." Section 10(a) of the FPA, 16 U.S.C. § 803(a) (1976). The Commission construed the word "shall" in section 4(e) as merely requiring the Com-

mission to "give great weight to the judgments and proposals of" Interior. Opinion No. 36 at 108. The Commission also noted that Interior had propounded conditions which were "deemed necessary" for all six Mission Indian reservations in the San Luis Rey River watershed. The Commission reasoned that Project No. 176 only occupies the lands of three of the reservations, although it indirectly affects the other three by reducing the flow of the San Luis Rey River, which passes through one of them and recharges groundwater basins beneath the other two. The Commission held that the license was "within" only the three reservations upon whose lands the canal lies, and that it was only with respect to the protection and utilization of these three reservations that Interior was authorized and required by Section 4(e) to propound conditions. We disagree with both of the Commission's conclusions.

### A. The Commission Must Accept Interior's Conditions.

■ The plain language of a statute controls its interpretation. *Maine v. Thiboutot,* 448 U.S. 1, 4, 9, 100 S.Ct. 2502, 2504, 2506, 65 L.Ed.2d 555 (1980). Because the relevant portion of section 4(e) is plain, our inquiry as to its meaning is at an end unless there is other statutory language in conflict with it. In particular, the Commission's vigorous historical argument cannot move us to ignore the fact that section 4(e) says, quite simply, that the license "shall include" the conditions which the Secretary "deems necessary."

The Commission also contends, however, that the apparently plain meaning of section 4(e) is at odds with the duty imposed on the Commission by section 10(a) of the Act. These two sections, however, can easily be harmonized. Section 10(a) generally gives the Commission authority to modify proposed projects before approval, so that they will be "best adapted to a comprehensive plan" for the utilization of waterways and the development of power. Section

10(a) of the FPA, 16 U.S.C. § 803(a) (1976). In the case of a project within a reservation, once the Secretary of the Interior has propounded those conditions deemed necessary for the protection and utilization of the reservation, the Commission is free to modify the proposal in other ways, but not by altering or omitting Interior's conditions, to make it feasible and beneficial to the public. If this cannot be done, the Commission may decline to issue a license at all. The fact that section 4(e) limits the Commission's authority under section 10(a) certainly does not render the two sections inconsistent. To conclude, as does the Commission, that the broad general authorization of section 10(a) is not only inconsistent with, but also overrides, the plain, specific limitation of section 4(e) is to ignore the most elementary canons of statutory construction. *See MacEvoy Co. v. United States*, 322 U.S. 102, 107, 64 S.Ct. 890, 893, 88 L.Ed. 1163 (1944) ("However inclusive may be the general language of a statute, it 'will not be held to apply to a matter specifically dealt with in another part of the enactment.'").

The Commission urges that giving section 4(e) its literal meaning will place in the hands of Interior an "unconditional veto power" over the licensing authority of the Commission, unless the Commission itself can review Interior's determination as to what conditions are necessary. We need not decide whether, if this contention were true, it would affect our view as to the meaning of section 4(e). For it is clear that no such "unconditional veto power" is involved here. First of all, any license issued by the Commission which includes conditions propounded by Interior will be subject to judicial review under section 313(b) of the FPA, 16 U.S.C. § 825*l*(b). Secondly, any failure by the Secretary of the Interior to conform to the statutory standard in proposing conditions pursuant to section 4(e) will be reviewable as a final agency action under the applicable provisions of the Administrative Procedures Act, 5 U.S.C. §§ 701–706 (1976). The spectre of an unconditional veto power, with which an ap-

pointed public official could frustrate the public policies underlying the FPA, is illusory.

■ For these reasons, we conclude that section 4(e) of the FPA requires the Commission to include in any license "within a reservation" those conditions which the Secretary "deems necessary for the protection and utilization" of that reservation.

### B. Project No. 176 Is Within All Six Reservations.

Project No. 176 lies partially within the geographical boundaries of three of the six reservations. There is no dispute as to whether the license is "within" those three reservations for purposes of section 4(e). Water rights of the other three reservations, the Pala, Pauma, and Yuima reservations, may be affected by the project, as they lie below the project in the San Luis Rey River watershed. The issue is whether or not the license is "within" these three reservations.

■ Section 3(2) of the FPA, 16 U.S.C. § 796(2) (1976), defines "reservation" as it is used in the FPA:

> "[R]eservations" means national forests, tribal lands embraced within Indian reservations, military reservations, and other lands and interests in lands owned by the United States, and withdrawn, reserved, or withheld from private appropriation and disposal under the public land laws
>
> . . . .

*Id.* There can be no serious question that the water rights of the Pala, Pauma and Yuima Bands appurtenant to the San Luis Rey River are "reservations" within the meaning of this definition. First of all, water rights are interests in land:

> A water right is generally considered to be real property or "land." As Wiel says, "the right to the flow and use of water being a right in a natural resource, is real estate." A water right is real property for purposes of determining title in a

quiet-title action, a mortgage recording requirement, satisfying the statute of frauds, descent and inheritance, and taxation.

1 R. Clark, ed., *Waters and Water Rights* § 53.1 at 345 (1967) (footnotes omitted). *See Hill v. Newman,* 5 Cal. 445 (1855); 1 Wiel, *Water Rights in the Western States* § 283 (3d ed. 1911). *See also Arizona v. California,* 373 U.S. 546, 596–97, 83 S.Ct. 1468, 1495–1496, 10 L.Ed.2d 542; *United States v. Ahtanum Irrigation District,* 236 F.2d 321, 334 (9th Cir. 1956), *cert. denied,* 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957). The Bands' water rights are owned by the United States. *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 809–10, 96 S.Ct. 1236, 1242–1243, 47 L.Ed.2d 483 (1976); section 3 of MIRA. The Bands' water rights are reserved from private appropriation under the public land laws. *Cappaert v. United States,* 426 U.S. 128, 138–39, 96 S.Ct. 2062, 2069–2070, 48 L.Ed.2d 523 (1976); *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). Thus, the Bands' water rights possess all of the elements of reservations as defined in section 3(2) of the FPA.

The Commission draws our attention to the fact that section 4(e) applies to licenses issued *within* reservations. It must be conceded that the word "within" tends to paint a geographical picture in the mind of the reader, and its presence in the statute lends support to the Commission's narrower view of Interior's duty and authority under section 4(e). We are thus confronted with a possible ambiguity on the face of the statute.

■ "[S]tatutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138 (1918), *quoted in Bryan v. Itasca County,* 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976). Although the FPA was not enacted primarily for the benefit of dependent Indian tribes, it is obvious that the ambiguous language of section 4(e) now under consideration was included by Congress for that precise purpose, and that the canon of statutory construction just mentioned should therefore apply to it. It is equally obvious from the plain language of the FPA that Congress intended to limit and circumscribe the broad authority granted to the Commission to issue licenses in the public interest, by requiring those licenses not to be detrimental to the interests of Indians on reservations. There is no guarantee, of course, that the tribal interests which the United States has a fiduciary duty to protect and defend will coincide with the interest of the public at large. A water and hydropower project might be vastly beneficial to the public in general, for instance, even though by inundating an entire reservation it might be utterly inimical to the interests of the Indians whose reservation is concerned. We find in the plain language of the FPA a policy to foster the development of water power projects in the public interest, to the extent, and only to the extent, that such can be done without abandoning the fiduciary duties owed by the United States to dependent Indian tribes.

A water project may occupy a geographical portion of an Indian reservation without impinging in any serious way on Indian interests—e.g., by crossing a corner of the reservation with a power line or an access lane. Conversely, a project may turn a potentially useful reservation into a barren waste without ever crossing it in the geographical sense—e.g., by diverting the waters which would otherwise flow through or percolate under it. We will not attribute to Congress, on account of the mere presence in its enactment of one ambiguous word, the perverse and illogical intention of guarding carefully against the former danger while openly embracing the latter. It is the necessary implication of the Commission's narrow construction of section 4(e) that Congress had just such an intent.

For all these reasons, we are compelled to reject the Commission's conclusion that its

duties under section 4(e), including the duty to accept the Secretary of the Interior's proposed conditions, and its duty to make findings as to whether the license is consistent with the reservations' purpose, apply to only the La Jolla, Rincon, and San Pasqual reservations. We hold, rather, that those duties exist also with respect to the Pala, Pauma, and Yuima Reservations.

CONCLUSION

Because the Commission has erred in its construction and application of section 4(e) of the FPA in this matter, a remand for further consideration is necessary. Interior's proposed conditions will have to receive a different treatment, consistent with the conclusions expressed in this opinion, in any further proceedings. Furthermore, as we have explained, no license issued by the Commission will, in and of itself, give any licensee a right-of-way across any reservation created pursuant to MIRA. We decline to overrule the Commission's conclusion that the licensing of Project No. 176 is within its statutory jurisdiction.

A number of other issues were presented in the petitions for review in this matter. In view of our conclusions expressed above, it would be inappropriate for us to reach those issues at this point in the proceedings.

REVERSED AND REMANDED.